UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,

                      Plaintiff,       No. 4:19-cr-00182-DGK

  v.                           Kansas City, Missouri
                                      May 28, 2019
IESHA T. BOLES,                 CRIMINAL

                      Defendant.


                     .........................

TRANSCRIPT OF WAIVER OF INDICTMENT AND PLEA OF GUILTY
BEFORE THE HONORABLE DAVID GREG KAYS
UNITED STATES DISTRICT COURT JUDGE

Proceedings recorded by electronic stenography
Transcript produced by computer

APPEARANCES:

For the Plaintiff:          MR. BRADLEY K. KAVANAUGH
                            Assistant United States Attorney
                            400 East Ninth Street
                            Suite 5510
                            Kansas City, Missouri 64106


For the Defendant:         MR. DAVID A. KELLY
                            Attorney at Law
                            114 Southwest Third Street
                            Lee's Summit, Missouri 64063

---

Judy K. Moore, CRR, RPR
United States Court Reporter
400 East Ninth Street, #8420
Kansas City, Missouri 64106
816.512.5622

1    (Proceedings commenced at 3:18 p.m.)

2    THE COURT:  All right.  This is case 19-182-01,

3 United States of America versus Ms. Iesha T. Boles.  Welcome,

4 Ms. Boles.  Ms. Boles appears with her attorney in this case,

5 Mr. Dave Kelly.  Also appearing today is Assistant United

6 States Attorney Mr. Brad Kavanaugh.  Also appearing is Special

7 Agent Jeffrey Brack from ATF.  Welcome.  And United States

8 Probation Officer Mr. Brant Bruner.

9    This case is called today for a waiver of indictment

10 and a waiver of arraignment and plea of guilty.  Mr. Kelly, I

11 think have you indicated that your client has difficulty

12 standing, sir?

13    MR. KELLY:  She does, your Honor.  Unlike the

14 previous defendant that was in here, I've actually taken her to

15 the -- she goes to the dialysis clinic three times a week.  And

16 I've actually seen her go in, and it's a real thing.  She's got

17 a PICC line in.

18    THE COURT:  Okay.

19    MR. KELLY:  And so between the dialysis and the

20 cardiovascular disease, she does have trouble standing for long

21 times.

22    THE COURT:  Could she stand long enough to take an

23 oath?

24    MR. KELLY:  Oh, sure.

25    THE COURT:  Ms. Boles, would you please stand, raise

1  your right hand, face our clerk and be sworn.

2            (The defendant was sworn by the courtroom deputy.)

3            THE COURT:  All right.  Please have a seat.  And,

4  Mr. Kelly, we're going to allow her to be seated.  One of the

5  reasons we like for people to stand is so the judge can hear,

6  so if you'll make sure she speaks in a clear voice and help us

7  with that, I'd appreciate it.

8            MR. KELLY:  I will, Judge.

9            THE COURT:  Ma'am, would you please begin by

10 speaking your full name and spelling your last name for us.

11           THE DEFENDANT:  Iesha T. Boles, B-O-L-E-S.

12           THE COURT:  Ms. Boles, a couple of things before we

13 get started.  You understand -- I know Mr. Kelly explains

14 things very well, but if you have any questions during the

15 course of this case, it will be very important for you to stop

16 us and let us know you have a question.  Will you do that?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  Also, you've just taken an oath, which

19 means you must tell the truth.  If you fail to tell the truth,

20 you can be prosecuted in a separate case for the crime of

21 perjury.  Do you understand that?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  Also, if you plead guilty today, you

24 can't come back later and withdraw your plea of guilty.  Do you

25 understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  So there are a couple of things we need

3     to talk about.  Mr. Kelly has provided to me a waiver of

4     indictment which appears to have your signature.  Did you sign

5     this waiver of indictment?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Did you sign this to indicate to me that

8     you are going to waive your right for a grand jury to hear your

9     case and decide if there's enough evidence to proceed?  You're

10    waiving that Constitutional right.  You understand that?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Do you have any questions about that

13    waiver?

14         THE DEFENDANT:  No, sir.

15         THE COURT:  Is that your desire, to waive this?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Okay.  At this time I'll accept your

18    waiver of indictment.  Also, since this is an indictment, that

19    means that we have an information filed in this case.

20         Mr. Kelly, do you wish to have your client formally

21    arraigned in this case?

22         MR. KELLY:  No, your Honor.  We would waive formal

23    reading.  Also indicate that we have received well in advance

24    of today a copy of the proposed information that has been

25    provided to the Court.  I also have a copy, so does my client,

1  so we would waive formal reading, enter a temporary plea of not

2  guilty, ask that bond be continued, and then we would ask that

3  the Court move to a plea of guilty.

4         THE COURT:  Are you comfortable your client

5  understands this information, Mr. Kelly?

6         MR. KELLY:  I do, Judge.

7         THE COURT:  The information is a charging document

8  that we use in lieu of indictment.  Ms. Boles, do you have any

9  question about the information in this case?

10        THE DEFENDANT:  No, sir.

11        THE COURT:  You've had a chance to talk to your

12 attorney, and you're comfortable that you understand everything

13 in this information, true?

14        THE DEFENDANT:  Yeah.

15        THE COURT:  Okay.  So this is the charge:  The

16 charge you're pleading guilty to is conspiracy to make false

17 statements during purchase of firearms.  And the range of

18 punishment for that charge...  Let's see if I can find this

19 here.  It's on Paragraph 5, I believe.  The maximum penalty is

20 not more than five years imprisonment, a $250,000 fine, three

21 years of supervised release, and a $100 mandatory special

22 assessment.  Upon your plea of guilty, you could be sentenced

23 anywhere within the range -- this range of punishment.  Do you

24 understand that?

25        THE DEFENDANT:  Yes, I do.

1          THE COURT:  Ms. Boles -- am I pronouncing your name

2   correctly?  Is it Boles?

3          THE DEFENDANT:  Yes.

4          THE COURT:  B-O-L-E-S?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Where are you from?

7          THE DEFENDANT:  Kansas City, Missouri.

8          THE COURT:  What's the highest level of education,

9   ma'am, that you've --

10          THE DEFENDANT:  I graduated high school.

11          THE COURT:  Does that mean, ma'am, that you have the

12   ability to read and write?

13          THE DEFENDANT:  I'm sorry?

14          THE COURT:  Do you have the ability to read and

15   write?

16          THE DEFENDANT:  Yes.

17          THE COURT:  I'll make you a deal.  I'll speak in the

18   microphone if you speak in the microphone.

19          THE DEFENDANT:  Yes.

20          THE COURT:  I'm sorry, I forgot to do that, too, Ms.

21   Boles.

22          What kind of work do you do, Ms. Boles?

23          THE DEFENDANT:  I don't.  I get SSI.

24          THE COURT:  You're receiving SSI.  Are you disabled?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  How long have you been disabled, ma'am?

2          THE DEFENDANT:  Oh, you're playing with my brain.  I

3   want to say '08.

4          THE COURT:  '08.  Did you work before that, ma'am?

5          THE DEFENDANT:  No, sir.

6          THE COURT:  Why not?

7          THE DEFENDANT:  I was getting welfare.

8          THE COURT:  Okay.  So in '08, you became disabled,

9   and what's the nature of your disability?

10         THE DEFENDANT:  What's...

11         THE COURT:  What is it that made you disabled?  What

12  do you suffer from that makes you disabled?

13         THE DEFENDANT:  I had a heart attack in my early

14  30's.

15         MR. KELLY:  A heart attack, Judge.

16         THE COURT:  A heart attack in your early 30's?

17         THE DEFENDANT:  Uh-huh.  I had a stent put in my

18  chest.  Or, rather, Truman Hospital put a stent in my chest in

19  my early 30's.

20         THE COURT:  So let's talk about your physical

21  health, right?

22         THE DEFENDANT:  Uh-huh.

23         THE COURT:  So since you had a heart attack, do you

24  have any heart-related issues that you deal with today?  I want

25  to talk about today, what you suffer from today.  What ails you

1  today, ma'am?  Let's go slow because I'm going to write all

2  this down.  Okay?

3          THE DEFENDANT:  Oh, uhm...

4          THE COURT:  You're on dialysis, so you have --

5          THE DEFENDANT:  Yes, I'm on dialysis.

6          THE COURT:  Let's talk about that.

7          THE DEFENDANT:  I have heart problems.  I'm HIV

8  positive.  What else?  That's really it.

9          THE COURT:  Okay.  Do you have trouble standing

10 because of your heart problems and your dialysis?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Okay.  How often do you undergo kidney

13 dialysis?

14         THE DEFENDANT:  Three days a week, sir; Monday,

15 Wednesday and Friday.

16         THE COURT:  How long have you been taking dialysis?

17         THE DEFENDANT:  Since February -- I started February

18 of this year.

19         THE COURT:  And do you take any other medications

20 related to the kidney dialysis?

21         THE DEFENDANT:  Yes, I do.  I've got the name of the

22 medicine that they have me on, but I have it at home.

23         THE COURT:  Is it one medicine?

24         THE DEFENDANT:  It's -- I believe it's two different

25 ones.

1         THE COURT:  Two different medicines, and it helps

2 your kidney function?

3         THE DEFENDANT:  Yes, sir.

4         THE COURT:  Let's talk about the HIV.  Do you take

5 medications for that?

6         THE DEFENDANT:  Yes, sir.

7         THE COURT:  Do you know what you take for that,

8 ma'am?

9         THE DEFENDANT:  Yes, sir.

10         THE COURT:  Can you speak it for the record?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Okay.  What?

13         MR. KELLY:  What's the name of the drug?

14         THE DEFENDANT:  Oh.  Tivicay is one of them.

15         THE COURT:  Tivicay?

16         THE DEFENDANT:  Yes.  And I forgot the other one.

17         THE COURT:  Okay.  And these are both --

18         THE DEFENDANT:  HIV meds.

19         THE COURT:  And then your heart problems, do you

20 take medication related to your heart problem, ma'am?

21         THE DEFENDANT:  Yes, I do, but the medications for

22 that is at home also.

23         THE COURT:  That's all right.  That's all right.

24 Can you give me an idea how many medications you take and what

25 they address, what they deal with?

1    THE DEFENDANT:  You're really playing my brain.  I'd
2  have to bring you the list and all that good stuff from home my
3  next visit.  I'd just have to bring everything.
4    THE COURT:  Do you know how many?  Can you give me a
5  guess.
6    THE DEFENDANT:  17.  I know I'm on, like, 17
7  different meds.
8    THE COURT:  You take 17 different medications just
9  for your heart?
10    THE DEFENDANT:  Actually, it's not all just heart.
11  It's a little bit of everything.
12    THE COURT:  Okay.  These medications affect high
13  blood pressure, maybe?  Is that fair?
14    THE DEFENDANT:  I need to be on my high blood
15  pressure meds, but I'm not on my high blood pressure meds
16  because I'm having problems going to go get it from Truman.
17    THE COURT:  So you take 17 medications.  This
18  includes the two --
19    THE DEFENDANT:  My HIV med.  I'm sorry to cut you
20  off, sir, but it entails my HIV meds, my diabetic meds...
21    THE COURT:  Okay.  We didn't say anything about
22  diabetes.
23    THE DEFENDANT:  I'm sorry.  Yes, I'm a diabetic.
24    THE COURT:  Okay.
25    THE DEFENDANT:  Yes, I'm a diabetic.  I'm sorry.

1  I'm insulin-dependent.

2          THE COURT:  Okay.  Does that -- so 17 medications

3  together, two for dialysis, two for HIV, and you don't know how

4  many for heart.  Do you know how many for your diabetes?

5          THE DEFENDANT:  I'm thinking maybe two or three,

6  because I know I take -- because I know I take gabapentin

7  because I have neuropathy in my feet.

8          THE COURT:  Anything else?

9          THE DEFENDANT:  No, sir.

10          THE COURT:  That's enough, right?

11          THE DEFENDANT:  Plus I'm asthmatic, too, and I'm on

12  an inhaler.  That's one of the 17.

13          THE COURT:  Okay.  Very good.  So all these 17

14  medications that you're taking, they're all prescribed by a

15  medical doctor; is that true?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  And are you taking these consistent with

18  the recommended dosage by that doctor?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Do these medications, as you sit here

21  today, affect your ability to work with your attorney or

22  understand what we're doing here today?

23          THE DEFENDANT:  No, sir.

24          THE COURT:  In fact, if you didn't take them, that

25  might affect your ability to understand your attorney and

1  participate in this hearing.  Is that fair?

2          THE DEFENDANT:  Right.

3          THE COURT:  Okay.  Mr. Kelly, is it your opinion

4  your client is competent and clear-headed and able to

5  understand what we're doing, sir?

6          MR. KELLY:  And, Judge, because of everything she

7  said, I just want to make a little bit more of a record rather

8  than saying I guess.  I've been working with her pre-indictment

9  under the CJA appointment for, I want to say almost four months

10  now.  I've had a chance to go and visit her in person at her

11  residence on, I want to say at least four occasions.  And she

12  has no transportation, so I brought her here today, and that's

13  why I ended up taking her to Research that one day, because she

14  didn't have any transportation to get there.

15          THE COURT:  Thank you, Mr. Kelly.

16          MR. KELLY:  So I have interacted with her on a

17  number of different occasions.  I've gone over the paperwork

18  with her well before today.  She's had it for, I want to say

19  now somewhere going on 45 days.  We've gone over it now on

20  three separate occasions.  I did have some concerns initially

21  that there might be a problem with mental health, a

22  component -- not necessarily because she has any kind of mental

23  health issue but because of physical issues affecting the

24  mental.  And honestly, it's been my experience that she's

25  pretty sharp and she takes care of herself the best she can.  I

1  know it's a challenge, but mentally, every time I've met with

2  her and I've talked to her about everything, she tracks

3  100 percent.  And if I was a psychologist, I'd probably say

4  something like she seems oriented to time, place and situation.

5  And on that basis, I think that, from what I've been able to

6  observe, I can say that she's mentally competent.

7         THE COURT:  Thank you.  Ms. Boles, have you ever

8  been diagnosed with any mental disability or mental issues?

9         THE DEFENDANT:  No, sir.

10         THE COURT:  All right.  Have any other attorneys

11  other than Mr. David Kelly represented you in this case?  Any

12  other attorneys other than Mr. Kelly?

13         THE DEFENDANT:  No.

14         THE COURT:  Are you satisfied with his services?

15         THE DEFENDANT:  Yes, I am.

16         THE COURT:  Do you have any --

17         THE DEFENDANT:  I have no complaints with Mr. Kelly.

18         THE COURT:  I'm sorry?

19         THE DEFENDANT:  I have no complaints with Mr. Kelly.

20         THE COURT:  Okay.  Very good.  So I know Mr. Kelly

21  does good work.  There's one thing he can't do for you, Ms.

22  Boles.  He can't make the decision to plead guilty.  That's

23  your decision and your decision alone.  Do you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Is it your decision, then, to plead

1 guilty here today?

2         THE DEFENDANT: Yes, sir.

3         THE COURT: Mr. Kavanaugh, pursuant to Lafler and

4 Frye, were there prior formal plea offers extended to this

5 defendant?

6         MR. KAVANAUGH: No, your Honor. This is the only

7 plea offer that was extended.

8         THE COURT: Do you agree with that, Mr. Kelly, this

9 is it?

10         MR. KELLY: That is accurate, Judge.

11         THE COURT: Ms. Boles, do you understand and do you

12 agree that this is the only formal plea offer the Government

13 gave to you? Is that true?

14         THE DEFENDANT: Yes.

15         THE COURT: Mr. Kavanaugh, sir, would you please

16 make a representation? I know there's a long fact scenario,

17 but if you could be brief, I would appreciate it. I'm

18 interested in what her role in the conspiracy was and all of

19 that, if you could help us with that.

20         MR. KAVANAUGH: Understood, your Honor. Between the

21 dates of July 7, 2014, and May 1, 2017, the defendant knowingly

22 conspired and agreed with James Samuels to transfer a total of

23 six firearms from Samuels to the defendant through a Federally

24 licensed firearms dealer. On each occasion, the defendant was

25 not the actual transferee or buyer. In addition, on each

occasion, the defendant knowingly made false statements as to
the identity of the actual buyer of each of the aforementioned
six firearms.  These knowingly made false statements -- or the
requirements of the identity are required under ATF Form 4473
to the FFL in order to complete each of the transfers.

As to five of the six firearms that were
transferred, they were subsequently reported stolen by the
defendant between approximately two to 135 days after the
transfer, and the last firearm that was transferred was
actually reported stolen twice by the defendant.

THE COURT:  And they weren't really stolen?

MR. KAVANAUGH:  They weren't really stolen, your
Honor.

THE COURT:  They were transferred to someone who
shouldn't have them?

MR. KAVANAUGH:  That is correct, your Honor.

THE COURT:  Under the law?

MR. KAVANAUGH:  That is correct.  The defendant knew
that she was not the actual transferee or buyer of each of
these firearms; nevertheless, she made the false representation
to the FFL that she would, in fact, be the transferee or buyer.

THE COURT:  And she knew that the person who would
receive these guns were people who were not qualified to --

MR. KAVANAUGH:  Well, the elements for making a
false statement during firearms purchase are as follows:  One,

1  that the defendant knowingly made a statement or

2  representation, in this case, on an ATF Form 4473.  Two, that

3  the defendant made the statement or representation to the

4  Federally licensed firearms dealer, which on each occasion that

5  occurred.  Three, that the statement or representation was

6  false.  And, four, that the defendant knew the statement or

7  representation was untrue when he or she made that statement or

8  representation.

9        That representation who's the actual transferrer or

10 buyer is required under ATF Form 4473, which is a form that an

11 FFL is required to maintain by Federal law.

12        THE COURT:  Yes, sir.  Okay.

13        Did you hear all that, Ms. Boles?

14        THE DEFENDANT:  Yes.

15        THE COURT:  Is that true?

16        THE DEFENDANT:  I only bought nine guns.  There

17 wasn't no 135.

18        MR. KELLY:  I think she misheard that part, Judge.

19 He said six.  I heard that.  He was talking about six.  So you

20 agree on the six?

21        THE DEFENDANT:  Yes.

22        THE COURT:  Well, you said nine.  Do we need to look

23 at this for...

24        MR. KELLY:  There were others that were --

25        THE COURT:  There were others but not charged.  I

1  understand.  Okay.  Thank you, Mr. Kelly.

2          So basically, Ms. Boles, let's make sure you and I

3  are on the same page here.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  You're making representations to this

6  Federal firearms license person to buy guns, and you knew these

7  representations you were making were false at the time, true?

8          THE DEFENDANT:  Yes.

9          THE COURT:  You had no intention of possessing these

10  guns, or at least for the long-term.  You knew that these guns

11  would go other places and you'd get money that way, I suspect.

12  Is that fair?

13          THE DEFENDANT:  No.

14          THE COURT:  What?

15          THE DEFENDANT:  No.

16          THE COURT:  That's not true?

17          THE DEFENDANT:  Yeah, it is.

18          THE COURT:  Okay.  Well, listen --

19          THE DEFENDANT:  Yeah, it is.

20          THE COURT:  Are you all right?

21          MR. KELLY:  She misheard again, Judge.

22          THE COURT:  You've got your head down.  I need you

23  to keep your head up, if you could, Ms. Boles.  Are you able to

24  do that?

25          THE DEFENDANT:  Yes, sir.

1          THE COURT:  Because if your head's down and you're

2    talking, I'm not hearing, right?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Okay.  So where did you buy these guns

5    at?  Where was the geographic location?

6          THE DEFENDANT:  It was in Kansas City.  Basically,

7    it was in North Kansas City.

8          THE COURT:  North Kansas City?

9          THE DEFENDANT:  Uh-huh.  It was a gun shop.

10          THE COURT:  Did you buy it from the same gun shop in

11   North Kansas City?

12          THE DEFENDANT:  The same -- Samuel took us to the

13   gun shop.

14          THE COURT:  Samuel took you to the gun shop in North

15   Kansas City?

16          THE DEFENDANT:  Yes.  Yes, he took us to the gun

17   shop, and that's when we -- he helped me purchase the gun.

18          MR. KAVANAUGH:  Your Honor, and as contained in more

19   detail under Paragraph 3 of the plea agreement, there were

20   multiple Federally firearms licensed dealers that the defendant

21   and her co-conspirator went to.  There was the Conceal and

22   Carry FFL, which is again in the Western District of Missouri.

23   There was --

24          THE COURT:  Now, you say Western District.  Could

25   you give me -- is it Kansas City, MO, or --

1          MR. KAVANAUGH:  Yes, your Honor.  12004 East 47th

2     Street, Kansas City, Missouri.

3          THE COURT:  Okay.

4          MR. KAVANAUGH:  Then there was C&R Sales at 1703

5     South Noland Road, Independence, Missouri, again within the

6     Western District of Missouri.  And then I believe what Ms.

7     Boles was referring to was the Mission Ready Gun Works --

8          THE DEFENDANT:  Yes.

9          MR. KAVANAUGH:  -- located at 1924 Lynn Street,

10    Kansas City, Missouri.  That's in North Kansas City, Missouri.

11         THE DEFENDANT:  Yes, sir.  I do remember that one.

12         THE COURT:  Thank you.

13         All right, Ms. Boles, so you agree with North Kansas

14    City.  Did you help facilitate and give a false statement on

15    the sale of a gun in Independence, Missouri, at C&R Sales?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  Okay, you didn't do that one.  What

18    about the Conceal and Carry gun place in KCMO?  Did you give a

19    false statement to get a gun in the Conceal and Carry business?

20         THE DEFENDANT:  Uh-huh.

21         THE COURT:  Could you say yes or no?

22         THE DEFENDANT:  Yes.

23         THE COURT:  We're picky.  We're writing everything

24    down, Ms. Boles, so I've gotta hear you and we've gotta have a

25    yes or no.  And the C&R Sales in Independence --

1    THE DEFENDANT:  Yes.

2    THE COURT:  -- you do recall going there?

3    THE DEFENDANT:  Yes.

4    THE COURT:  And all these places were places that

5    you gave false statements, got guns, and then they went down

6    the road to someone else, true?

7    THE DEFENDANT:  Yes, sir.

8    THE COURT:  Okay.  Mr. Kavanaugh, I'm hoping you

9    think we've covered everything with her so far.  We can go

10   anywhere we need to go.  Anything else?

11   MR. KAVANAUGH:  We've covered the six firearms, the

12   three locations, all occurred within the Western District of

13   Missouri, and that she knowingly made false representations on

14   a Form ATF 4473 in order to effectuate each of those.  I

15   believe that is the elements of the crime.

16   THE COURT:  Yes, sir.  Okay.

17   So we're clear, Ms. Boles, I think you already said

18   this, you knew when you filled out that form you were telling a

19   lie?  It was not true, and you knew it, and you wanted them to

20   believe that it was true, though; is that correct?

21   THE DEFENDANT:  Yes, sir.

22   THE COURT:  Okay.  I want to go down the road here.

23   So you and your attorney have entered a plea

24   agreement with the Government.  Do you recall doing that?

25   THE DEFENDANT:  Yes, sir.

1          THE COURT:  In fact, on the last page of that plea

2  agreement, Page 13, is a signature block with your name.  Did

3  you sign that?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Did you sign that to indicate to me that

6  you've read this and you've understood everything in that plea

7  agreement?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Other than this plea agreement, have any

10  other promises or agreements been made to you to cause you to

11  plead guilty here today?  Everything -- every deal you've got

12  with the Government is in this plea agreement; is that true?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Has anyone threatened or abused you or

15  your family that caused you to plead guilty?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Are you under the influence of any

18  drugs, alcohol or medicines --

19          THE DEFENDANT:  Oh, no.

20          THE COURT:  -- other than the 17 medications you

21  referenced?  That's all you're taking, right?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Okay.  Do you understand this is an

24  agreement with the Government; this is not my agreement?  I

25  respect these, but I don't have to follow these agreements.  Do

1  you understand that?

2  THE DEFENDANT:  Yes, sir.

3  THE COURT:  Now, one of the things you and your

4  attorney have talked about are the sentencing guidelines; is

5  that true?

6  THE DEFENDANT:  Yes, sir.

7  THE COURT:  In fact, that's found on Page --

8  Paragraph 10, Pages 6 through 7.  These guidelines are things

9  that we must calculate in every case.  Mr. Kelly is an expert

10  in that, as is Mr. Kavanaugh and the United States Probation

11  Office.  But, really, it's up to the judge to calculate those.

12  Do you understand that?

13  THE DEFENDANT:  Yes, sir.

14  THE COURT:  So the best Mr. Kelly can do, even

15  though he's got a lot of experience, is to give you an

16  estimate.  Do you understand that?

17  THE DEFENDANT:  Yes, sir.

18  THE COURT:  Guidelines are just one of the many

19  things that judges consider.  We also consider things like your

20  history, your characteristics, the nature of the crime, the

21  need to protect the public.  Those are all the types of

22  analysis that we conduct.  Do you understand that?

23  THE DEFENDANT:  Yes, sir.

24  THE COURT:  You could be sentenced below the

25  guidelines or above the guidelines.  The guidelines are just

1  one of the many factors we look at.  Do you understand that?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Do you understand you're pleading guilty

4  to a felony crime?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Have you ever been convicted of a felony

7  crime before?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  You understand, then, as a convicted

10  felon, you're likely to lose valuable civil rights?  Those

11  rights include, among other things, your right to vote, your

12  right to hold public office, your right to serve on a jury,

13  your right to possess firearms or ammunition.  Do you

14  understand that, ma'am?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Also by pleading guilty, that means

17  we're not going to have a trial in your case.  You're waiving

18  your right to trial and many trial-related rights.  Those

19  include your right to persist and maintain your plea of not

20  guilty, your right to trial by jury, your right to be

21  represented by counsel and, if necessary, have the Court

22  appoint counsel at trial and every other stage of the

23  proceeding, your right at trial to confront and cross-examine

24  adverse witnesses, to be protected from compelled

25  self-incrimination, to testify and present evidence, and to

1  compel the attendance of your own witnesses.  By pleading

2  guilty, you're waiving these rights as well.  Do you understand

3  that?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  I think you've answered my questions.

6  Do you have any questions for me?

7          THE DEFENDANT:  No, sir.

8          THE COURT:  Well, let's do this officially, then.

9  To the charge set forth in Count 1 of this information, do you

10  plead guilty or not guilty, Ms. Boles?

11          THE DEFENDANT:  Guilty.

12          THE COURT:  Very well.  It is the finding of this

13  Court in this case that Ms. Iesha T. Boles is fully competent

14  and capable of entering an informed plea, that she's aware of

15  the nature of the charges, the consequences of this plea, and

16  this plea of guilty is a knowing and voluntary plea supported

17  by an independent basis in fact containing each of the

18  essential elements of the offense.  Your plea is therefore

19  accepted, ma'am.  You now are adjudged guilty of the offense

20  charged in Count 1 of the information.

21          At this time I'll order a pre-sentence investigation

22  to be completed.  I would encourage you to cooperate with the

23  report writer so we can get a clear and accurate picture of you

24  and of this offense.  As soon as that's complete, we'll meet

25  again and we'll -- is this Judge Bough's case, by chance.

1          COURTROOM DEPUTY:  It will transfer to us.

2          THE COURT:  It will be ours?  Okay.  Then we'll meet

3  again and we'll calculate the guidelines and work on an

4  appropriate sentence.  Anything else on behalf of the

5  Government?

6          MR. KAVANAUGH:  No, your Honor.

7          THE COURT:  Thank you.  Mr. Kelly, sir?

8          MR. KELLY:  Just that the Court, I know, has not set

9  it, but she is continued on bond.  Because we're all doing this

10 all at once, she continues on bond that was just --

11         THE COURT:  That's an agreement you have with the

12 Government, right?

13         MR. KELLY:  That's correct, sir.

14         THE COURT:  Sure.  I'll respect that.  There's no

15 reason that I incarcerate her at this time, is there?

16         MR. KAVANAUGH:  No reason at all.

17         THE COURT:  Okay.  Very good.  Ms. Boles, listen,

18 you've got two jobs.  One is to make yourself available to your

19 attorney so Mr. Kelly can work with you, but more important

20 than that, even, is to make yourself available to the Court so

21 we can find you and you can demean yourself to the supervision

22 of pre-trial.  Can you do that?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  All right.  Good luck to you, ma'am.

25 Thank you.

1    MR. KELLY:  Thank you, Judge.

2        (Proceedings concluded at 3:51 p.m.)

3

4                  CERTIFICATE

5    I certify that the foregoing is a correct transcript

6 from the record of proceedings in the above-entitled matter.

7

8 November 4, 2019

9

10
                /s/Judy K. Moore
11              JUDY K. MOORE, CRR, RPR
                United States Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25